HENNA ET AL., DEMANDANTES Y APELANTES, *v.* SAURÍ Y SUBIRÁ, DEMANDADA Y APELADA.

APELACIÓN procedente de la Corte de Distrito de Ponce en causa sobre restablecimiento y reconocimiento de hipoteca y nulidad.

No. 1180.—Resuelto en julio 20, 1915.

CONTRATOS—PERFECCIONAMIENTO POR ESCRITURA PÚBLICA—CONDICIÓN EXPRESA—COMPRAVENTA—COINCIDENCIA DE VOLUNTADES.—Así como los contrayentes pactan que su contrato no se repute perfeccionado mientras no se haga constar en escritura pública y habrá que respetar ese pacto, así también cualquiera otra condición expresa que se estipule para que en ella estribe la perfección contractual de la compraventa, deberá igualmente ser atendida, porque hasta

que aquella se cumpla no cabrá afirmar la coincidencia de voluntades que vivifica el contrato y éste no se entenderá perfecto en tanto no se den por realizados todos y cada uno de los supuestos de que parta.

ID.—CONDICIÓN DEL CONTRATO PRINCIPAL—OBLIGACIONES ESENCIALES DE COMPRADOR Y VENDEDOR.—Los pactos a que se refiere el artículo 1222 del Código Civil cuando constituyen condición del contrato principal, surten el mismo efecto jurídico observándolos o no cumpliéndolos, que cuando se quebrantan o respetan las obligaciones esenciales de comprador y vendedor.

ID.—VOLUNTAD DE LAS PARTES EN ORDEN A LA EFECTIVIDAD DEL CONTRATO—PERFECCIONAMIENTO—CONDICIONES.—Cuando a la voluntad de las partes en orden a la efectividad del contrato, y al extremo esencial de su perfectibilidad, se incorpora una condición, es manifiesto que mientras la condición no se cumpla, la voluntad tampoco se realiza.

HIPOTECA—EJECUCIÓN DE HIPOTECA—CERTIFICACIÓN DEL REGISTRO—DOMICILIO DE LOS INTERESADOS—NOTIFICACIÓN DEL AUTO—REQUISITOS DEL ARTÍCULO 262 DE LA LEY DE ENJUICIAMIENTO CIVIL ANTIGUA.—De acuerdo con el párrafo 5°. del artículo 171 del reglamento para la ejecución de la Ley Hipotecaria, cuando en la certificación del registro que ha de acompañarse a la demanda constan los domicilios de las personas interesadas, el juez mandará que se intente la notificación del auto; pero el hecho de que no aparezca que se haya cumplido por el actuario con los requisitos del artículo 262 de la Ley de Enjuiciamiento Civil antigua, dando copia literal de ella, firmada, expresando el negocio a que se refiere, ni expresando esos hechos en la diligencia, no prueba su incumplimiento.

ID.—NOTIFICACIÓN A LOS INTERESADOS EN INSCRIPCIONES POSTERIORES—OBJETO DE LA NOTIFICACIÓN.—La notificación a las personas interesadas en las responsabilidades inscritas después del derecho del ejecutante del auto requiriendo de pago al deudor tiene por objeto informarles del procedimiento a fin de que puedan concurrir a la subasta si les conviniere.

ID.—HIPOTECAS CONSTITUÍDAS ANTES DE REGIR LA LEY HIPOTECARIA DE 1893—EJECUCIÓN DE HIPOTECAS—VALORACIÓN DE LAS FINCAS—TIPO PARA LA SUBASTA.—Cuando en hipotecas constituídas antes de regir la Ley Hipotecaria de 1893 no se haya consignado que la valoración de las fincas gravadas habrá de servir de tipo para la subasta que se verifique en caso de ejecución, es necesario que se presente un documento en que conste la conformidad de los deudores en una valoración para la subasta o pedir el justiprecio judicial.

ID.—EJECUCIÓN DE HIPOTECA—EDICTOS DE SUBASTA—SITIOS PÚBLICOS—BARRIOS EN QUE RADICAN LAS FINCAS.—Si bien el artículo 172 del reglamento de la Ley Hipotecaria requiere que los edictos para la subasta se fijen en los sitios públicos de costumbre del lugar en que se siga el procedimiento y del en que los bienes radican, no exige que se haga la publicación en los barrios en que se encuentran las fincas sacadas a remate.

ID.—EDICTOS DE SUBASTA—COLINDANCIAS—BARRIOS DONDE RADICAN LAS FINCAS.—Aun cuando en los edictos de subasta no se expresen las colindancias y barrios donde radican las fincas, es suficiente si en ellos constan los nombres con que son conocidas, los de sus dueños, el número de cuerdas que contienen y sus precios, así como dónde se encuentran los títulos de propiedad.

ID.—EDICTOS DE SUBASTA—ACREEDORES POSTERIORES:—La razón de que se exprese en los edictos de subasta los nombres de los acreedores posteriores es el de

poner en su conocimiento el procedimiento ejecutivo cuando no ha sido posible notificarles el auto de requerimiento de pago, según dispone el artículo 172, párrafo 2°. del Reglamento de la Ley Hipotecaria.

ID.—PUBLICACIÓN DE EDICTOS POR MENOS TIEMPO DEL REQUERIDO—NULIDAD DE LA SUBASTA—RENUNCIA POR EL DEUDOR—PERJUICIOS.—La falta de publicar los edictos por menos tiempo del requerido por la ley no anula necesariamente la subasta toda vez que puede ser renunciada por el deudor, y para que un acreedor posterior pueda obtener la declaración de nulidad por ese motivo, es un principio general de derecho que debe demostrar que ha sido seriamente perjudicado.

ID.—ACREEDOR HIPOTECARIO POSTERIOR—DERECHO SOBRE EL VALOR DE LOS BIENES.—Un acreedor hipotecario posterior no tiene otro derecho sobre el valor de los bienes hipotecados que a cobrarse con la diferencia entre los créditos hipotecarios anteriores y el real y positivo del inmueble.

COSTAS Y DESEMBOLSOS—HONORARIOS DE ABOGADO—CULPABILIDAD O TEMERIDAD—DISCRECIÓN JUDICIAL—ABUSO DE DISCRECIÓN.—La ley faculta a los jueces para, discrecionalmente, imponer las costas y desembolsos del pleito a la parte que lo pierda, teniendo en cuenta el grado de culpabilidad o temeridad, y también los honorarios de abogado en reclamaciones que excedan de quinientos dollars, y a menos que se demuestre abuso de esa discreción sus resoluciones deben sostenerse.

Los hechos están expresados en la opinión.

Abogado de los apelantes: *Sr. José A. Poventud.*

Abogado de la apelada: *Sr. Antonio F. Castro.*

EL JUEZ ASOCIADO SR. ALDREY, emitió la opinión del tribunal.

La sociedad Saurí, Subirá y Compañía llegó a ser dueña de dos hipotecas por sucesivas transacciones, constituídas la primera en el año 1880 y la segunda en 1885, por los hermanos don Guillermo y don Santiago Oppenheimer Bettini sobre tres fincas de su propiedad nombradas "Consuelo-Vayas," "Aguas-Prietas" e "Isabel," radicadas en barrios del término municipal de Ponce. Sobre las dos primeras fincas constituyeron los mismos hermanos Oppenheimer otra tercera hipoteca que llegó a pertenecer a don Gustavo Cabrera Rosaly.

En la escritura de 15 de diciembre de 1880 de compraventa de la hacienda "Aguas-Prietas" e hipoteca voluntaria sobre las fincas "Aguas-Prietas" y "Consuelo-Vayas" otorgada por los hermanos Oppenheimer se hizo constar por la cláusula segunda de las de venta que "Aguas-Prietas" la ena-

jenaba su dueño don Joaquín P. Valdivieso en cuarenta mil pesos; por la tercera declararon los contratantes que esa cantidad era el justo y verdadero valor de las tierras y establecimientos que se vendían; por la cláusula tercera del otorgamiento sobre hipoteca voluntaria, se constituyó esa hipoteca sobre los mismos terrenos que adquirieron los hermanos Oppenheimer de don Joaquín P. Valdivieso y además sobre "Consuelo-Vayas," diciendo así la cláusula octava de dicho otorgamiento de hipoteca voluntaria: "*Octava:* Que dicha finca 'Consuelo-Vayas' de común acuerdo le dan un valor de ochenta mil pesos de moneda corriente comercial."

En la escritura de 30 de abril de 1885, por la que se constituyó la segunda hipoteca por los propios hermanos Oppenheimer se dice en el hecho tercero lo que sigue: "*Valor:* De común acuerdo entre los comparecientes, y para los efectos de este contrato, valoran las fincas reseñadas en esta forma: la hacienda 'Consuela-Vayas' en la suma de setenta mil pesos; los terrenos y establecimientos de la que se llama 'Aguas-Prietas' en la cantidad de cuarenta mil pesos; y los terrenos correspondientes a la hacienda 'Isabel' en doce mil doscientos cincuenta pesos, todo de moneda corriente comercial."

En 23 de noviembre de 1897 la sociedad Saurí, Subirá y Compañía, dueña de las dos primeras hipotecas, presentó demanda por el procedimiento ejecutivo de la ley hipotecaria en el juzgado de primera instancia de Ponce contra don Santiago Oppenheimer Bettini y la Sucesión de don Guillermo de los mismos apellidos, compuesta de la viuda e hijos que en ella se nombraron y pidieron que se les requiriese para que pagasen las deudas garantizadas con esas hipotecas dentro de treinta días y que si no lo verificaban se sacasen los bienes hipotecados a pública subasta. De la certificación de cargas librada por el registrador, y acompañada con la demanda resultaba la existencia de una tercera hipoteca a favor de don Gustavo Cabrera Rosaly.

Requeridos de pago los deudores por orden del juzgado, y transcurrido el plazo que se les dió para verificarlo sin que

lo hubiesen efectuado, la sociedad ejecutante pidió que se sacasen los bienes hipotecados a pública subasta y que, toda vez que por haberse constituído los créditos hipotecarios antes de regir la ley hipotecaria entonces en vigor no se consignó precio para caso de remate y era necesario verificar el justiprecio de las fincas por peritos tasadores, de acuerdo con la Ley de Enjuiciamiento Civil, como supletoria, se ordenase el avalúo de las fincas a cuyo fin hizo la designación de su perito. También pidió que se le hiciera saber al acreedor posterior don Gustavo Cabrera el estado del juicio por si quería tomar parte en la subasta y avalúo de los bienes. En 1°. de enero de 1898 mandó el juzgado poner en pública subasta los bienes hipotecados, por término de veinte días y que se fijasen edictos en los sitios públicos de costumbre de la ciudad, y del en que los bienes radiquen, y que se insertase en la *Gaceta* de la isla con expresión de los títulos de propiedad, para lo cual oportunamente se fijaría el día en que debía verificarse la subasta, luego de practicado el avalúo que se solicitaba. También resolvió se hiciera saber a don Gustavo Cabrera el estado de la ejecución a los efectos que le interesaran. En 15 del mismo mes y año y teniendo presente los actuarios a don Gustavo Cabrera le hicieron saber el estado de la ejecución a los efectos que pudieran interesarle y firmó con ellos la diligencia.

Practicado el avalúo de los bienes fué señalado el día 18 de marzo para la subasta y se ordenó hacer las fijaciones y publicaciones oportunas. En consecuencia, el escribano extendió dos edictos en 24 de febrero de 1898, que fijó el mismo día en las puertas del juzgado y de la escribanía, y de los que entregó copias al ejecutante para su publicación, haciendo constar la fecha señalada para la venta en pública subasta de las fincas "Consuelo-Vayas," "Aguas-Prietas" e "Isabel," especificando la valoración de sus tierras, que en la oficina del escribano se encontraban los títulos de propiedad de los bienes que se remataban y que no constaba de la certificación expedida por el registrador de la propiedad ha-

berse inscrito o anotado derechos sobre los bienes que se subastan, con posterioridad a los de los ejecutantes.

El mencionado edicto fué publicado en la *Gaceta de Puerto Rico* correspondiente a los días 4, 5 y 6 de marzo de 1898.

Ese juicio terminó en 1898 con la adjudicación de las fincas a favor de Saurí, Subirá y Compañía quienes, según la liquidación que se practicó y de la que fué notificado don Gustavo Cabrera, no cubrieron sus créditos; y con una orden posterior para la cancelación de la tercera hipoteca de dicho señor Cabrera.

Algunos meses antes de comenzar Saurí, Subirá y Compañía el expresado juicio ejecutivo, firmaron un contrato privado con don Santiago Oppenheimer, con fecha 6 de mayo de 1897, cuyo tenor es el siguiente:

"Conste por este extrajudicial documento que queremos tenga la misma fuerza y valor de judicial, que nosotros los abajo firmados, Señores Saurí, Subirá & Ca. y don Santiago Oppenheimer y Bettini de este domicilio, hemos convenido y pactado lo siguiente: PRIMERO. En atención a que los Señores Saurí, Subirá & Ca. cesionarios de los Señores Redfern, Alexander & Co. de Londres, respecto a un crédito hipotecario que éstos tenían sobre las haciendas 'Aguas-Prietas,' 'Isabel' y 'Consuelo-Bayas' de este término municipal, tratan de hacer valer sus derechos por la vía judicial, el Señor Oppenheimer en su cualidad de condueño de dichos fundos, se compromete y obliga en la más solemne forma a no entorpecer ni gestionar nada en contra de lo que intentaren aquellos, sino por el contrario renuncia y traspasa a favor de los mismos cuantos derechos le corresponden y corresponderle puedan sobre las referidas haciendas. SEGUNDO. Los Señores Saurí, Subirá & Ca., se comprometen y obligan a su vez en la forma dicha, a cambio de la renuncia y traspaso que a su favor hace el Señor Oppenheimer, a pagar a ésta la suma de cuatro mil pesos de moneda corriente, en la siguiente forma: Un mil pesos, el mismo día en que tomen posesión de todos los terrenos de que se componen las haciendas 'Aguas-Prietas,' 'Isabel' y 'Consuelo-Bayas'; y los tres mil pesos restantes a dos años de la fecha de toma de posesión de dichos fundos, sin que estas sumas devenguen intereses de ninguna clase en el expresado plazo. TERCERO. El Señor Oppenheimer tendrá derecho a usufructuar y usufructuará durante los dos años que tiene que esperar para percibir los tres mil pesos de que

se trata en el hecho que antecede, los terrenos de pastos de dichos fundos, que hoy usufructúa y en los que tiene una casa de su propiedad, sin que por dicho beneficio tenga que pagar ninguna clase de arrendamientos; pero con la condición de que, si a los Señores Saurí, Subirá & Ca. conviniera entregar al Señor Oppenheimer, antes de vencerse el plazo de los dos años dichos, los expresados tres mil pesos, éste tendrá que recibirlos forzosamente, y cesará desde luego el beneficio de usufructo de que se ha hecho mérito; debiendo el Señor Oppenheimer desocupar los terrenos en un plazo que no podrá exceder de tres meses a partir de la fecha en que reciba aquella suma. CUARTO. Si por cualquier circunstancia no pudieran los Señores Saurí, Subirá & Ca. entregar al Señor Oppenheimer los tres mil pesos en el plazo dicho, éste les concede una prórroga de cuatro meses más, en cuyo caso devengará la repetida cantidad el uno por ciento mensual en dicha prórroga, vencida la cual, no podrán dichos señores diferir el pago de la misma en modo alguno; a cuyo efecto obligan sus bienes presentes y futuros. QUINTO. Si llegado el momento de desocupar los terrenos que usufructúe el Señor Oppenheimer, éste no lo verifica en el término y tiempo para ello prefijado, quiere y consiente que los Señores Saurí, Subirá & Ca., le desahucien en la forma que más les conviniere, y se compromete a pagarles todos los gastos judiciales y extrajudiciales que hicieren con tal motivo; a cuyo fín obliga sus bienes habidos y por haber. SEXTA. Este contrato empezará a regir y surtirá sus efectos legales, tan pronto como los Señores Saurí, Subirá & Ca. hayan tomado posesión de las haciendas 'Aguas-Prietas,' 'Isabel' y 'Consuelo-Bayas,' de que se ha hecho mérito; no teniendo más valor por ahora que el de compromiso de contrato. Bajo dichas condiciones dejamos establecido nuestro convenio que nos obligamos a guardar y cumplir en todas sus partes firmándolo por duplicado en Ponce, a 6 de mayo de 1897. S. Oppenheimer. Saurí, Subirá & Ca.''

El primer pago de mil pesos fué hecho un año después, en 6 de marzo de 1898.

Otro contrato sustancialmente igual, excepto que no contiene la facultad de usufructuar terreno, suscribieron en la misma fecha la sociedad mencionada y doña Ana Salomons viuda de don Guillermo Oppenheimer y el primer pago fué hecho el 26 de junio de 1898, después de habérsele dado por

el juzgado en 28 de marzo posesión de las fincas a la sociedad ejecutante como consecuencia de la adjudicación que se le hizo en el ejecutivo; posesión que no tuvieron hasta ese momento.

Años después, en 19 de agosto de 1912 los componentes de la sucesión de don Gustavo Cabrera Rosaly presentaron demanda, que luego enmendaron, ante el Tribunal de Distrito de Ponce, contra la sociedad Saurí y Subirá, derecho habiente de Saurí, Subirá y Compañía por la que alegando diversos vicios de procedimiento en·el ejecutivo de que hemos hecho mención y que como consecuencia de los contratos privados reseñados quedó extinguido y anulado el título de Saurí, Subirá y Compañía que sirvió de base después a la acción hipotecaria que entablaron con perjuicio del causante de los demandantes, pidieron sentencia a su favor por la que se declarase que la hipoteca de don Gustavo Cabrera Rosaly está vigente, restablecida y se obligase a la demandada a que la reconozca y que se declare la nulidad de las actuaciones habidas en el procedimiento ejecutivo hipotecario seguido por Saurí, Subirá y Compañía a contar desde el escrito inicial o por lo menos desde el requerimiento de pago, todo con las consiguientes cancelaciones en el registro de la propiedad, con pago de costas.

Contestada la demanda se celebró el correspondiente juicio, después del cual el tribunal inferior dictó sentencia con fecha 11 de junio de 1914, registrada el mismo día, por la que declaró sin lugar la demanda con imposición de costas, desembolsos y honorarios de abogado, a la parte demandante.

La parte perjudicada por esa sentencia interpuso recurso de apelación contra ella y también contra una resolución posterior resolviendo la impugnación que hizo al memorándum de costas de los demandados, a la que nos referiremos después.

Ocho son los errores que alega la parte apelante que cometió el juez al dictar su sentencia y en los que se apoya para que la revoquemos. Los consideraremos por el mismo orden en que han sido presentados:

El primer motivo de error dice así:

"1º. La corte inferior cometió error al no estimar que hubo con-
fusión de derechos que extinguió los títulos hipotecarios de los Señores
Saurí, Subirá & Ca. por razón de los documentos otorgados en 6 de
mayo de 1897, antes de la demanda ejecutiva hipotecaria, entre dichos
ejecutantes Saurí, Subirá & Ca. y los condueños de las fincas hipo-
tecadas don Santiago Oppenheimer y doña Ana Salomons por cuyo
documento se obligaron éstos a no entorpecer el juicio hipotecario y
cedieron sus derechos en las fincas por ejecutar a los mencionados
ejecutantes."

Argumentando este motivo de error sostiene la parte ape-
lante que por virtud de los documentos privados suscritos
entre Saurí, Subirá y Compañía y don Santiago Oppenheimer
y doña Ana Salomons, viuda de don Guillermo Oppenheimer,
el título de aquéllos quedó extinguido por haberse reunido en
una misma persona los conceptos de acreedor y de deudor
antes de iniciarse el procedimiento ejecutivo y se convirtió
Saurí, Subirá y Compañía en deudor del tercer acreedor hipo-
tecario, don Gustavo Cabrera, toda vez que los dueños cedie-
ron sus derechos y acciones en las fincas a dicha sociedad por
lo cual, o se ejecutaron a sí mismos como dueños, o por lo
menos ejecutaron con un título hipotecario que estaba extin-
guido y sin fuerza ejecutiva alguna.

Como se ve, esta argumentación descansa en el supuesto
de que esos contratos privados era la cesión de derechos y
acciones en la propiedad de las fincas hipotecadas y que tal
cesión surtió efecto desde la fecha de los contratos.

Dados los términos en que están redactados esos docu
mentos tenemos que llegar a la conclusión de que la causa
de que se ofreciese pagar cierta cantidad de dinero fué el com-
promiso que hicieron los que habían de recibirla de no entor-
pecer el procedimiento judicial que había de iniciarse para
el cobro de las hipotecas y que aun cuando se consignó tam-
bién que se renunciaban y traspasaban a favor de los señores
Saurí, Subirá y Compañía cuantos derechos correspondían
en las haciendas a don Santiago Oppenheimer y a doña Ana

Salomons, viuda de don Guillermo Oppenheimer, no se tra
taba de verdadera cesión de los derechos dominicales, como lo
demuestra la estipulación de la cláusula sexta, según la cual
el contrato y el pago no tendría lugar hasta que a la sociedad
Saurí, Subirá y Compañía se le diera posesión judicial de las
fincas y mal podía ser la causa del contrato la cesión de dere-
chos dominicales si ésta no había de producir efecto alguno
hasta que la sociedad fuera ya dueña por título de adjudica-
ción porque entonces resultaría un contrato sin causa y tam-
bién por que si alguna persona compraba las fincas en el
remate judicial y satisfacía la reclamación de la sociedad
acreedora la cesión de derechos consignada en los contratos
privados no podía producir efecto alguno.

Por tanto la verdadera y única causa que aparece de los
contratos fué la que antes hemos consignado de no entorpecer
el procedimiento ejecutivo, por lo que no puede sostenerse
ni podemos declarar que los señores Saurí, Subirá y Compañía
fueron dueños de las fincas que les estaban hipotecadas antes
de que iniciaran su juicio ejecutivo, ni tampoco, en conse-
cuencia, que en ellos se confundieron los derechos de dueños
y de deudores, que se extinguió su crédito hipotecario y que
ejecutaron con un título sin fuerza legal.

Además, entre los señores Saurí, Subirá y Compañía y
los otorgantes de tales documentos no hubo contrato alguno
valedero hasta un año después de firmados cuando en 21 de
marzo de 1898 se les dió a aquellos posesión judicial en virtud
de adjudicación que se les hizo en pago parcial de sus cré-
ditos porque habiendo convenido expresamente que hasta en-
tonces no surtieran sus efectos legales y fijado esa condición
como el origen o nacimiento de los derechos recíprocos entre
las partes, había que respetar tal convenio perfectamente
lícito porque de acuerdo con el artículo 1222 los contratantes
pueden establecer los pactos, cláusulas y condiciones que ten-
gan por conveniente, siempre que no sean contrarios a las
leyes, a la moral ni al orden público.  Con respecto a este

particular dice el comentarista Scaevola en el tomo 23, páginas 321 al 323 lo siguiente:

"La regla acabada de exponer, es la fundamental, la genérica; pero así como si los contrayentes pactan que su contrato no se repute perfeccionado mientras no se haga constar en escritura pública, habrá que respetar este pacto (y esta es la enseñanza de la jurisprudencia antigua ya registrada, con relación a la *ley 6ª., Título V de la Partida 5ª.,* y será seguramente la de la moderna cuando el caso se presente), así también cualquiera otra condición expresa que se estipule para que en ella estribe la perfección contractual de la compraventa, deberá igualmente ser atendida, porque hasta que aquélla se cumpla, no cabrá afirmar la coincidencia de voluntades que vivifica el contrato, y éste no se entenderá perfecto en tanto no se den por realizados todos y cada uno de los supuestos de que parta.

"Sanciona el artículo 1255, para todos los casos de contratación, que los contratantes puedan establecer los pactos, cláusulas y condiciones *que tengan por conveniente,* siempre que no sean contrarios a las leyes, a la moral, ni al orden público. Y esos pactos, cuando constituyen condición del contrato principal, surten el mismo efecto jurídico, observándolos o no cumpliéndolos, que cuando se quebrantan o respetan las obligaciones esenciales de comprador y vendedor, a que alude el precepto que analizamos.

❈        ❈        ❈        ❈        ❈        ❈        ❈

"A la inversa, cuando la voluntad de las partes, en orden a la efectividad del contrato y por de contado al extremo esencial de su perfectibilidad, se incorpora a una condición, es manifiesto que mientras la condición no se cumple, la voluntad tampoco se realiza; y como la voluntad es el contrato dentro del más puro sentido consensualista, dicho se está que aquél no nace, porque el consentimiento no se perfecciona, y la perfección del consentimiento es consustancialmente la del contrato."

El siguiente error que se alega dice:

"2º. La corte inferior cometió error al estimar en su relación del caso 'que don Gustavo Cabrera y Rosaly fué personalmente notificado, en su carácter de acreedor hipotecario posterior a los ejecutantes Saurí, Subirá & Ca. del auto del tribunal ordenando el requerimiento de pago a los deudores y de todo el procedimiento.' "

Ya hemos consignado que don Gustavo Cabrera Rosaly, posterior acreedor hipotecario, fué personalmente instruído

del estado que tenía el procedimiento cuando después de trans-currir el plazo de treinta días que se dió a los deudores para pagar se ordenó el avalúo de las fincas y que se sacasen a remate público, y aunque en el presente motivo del recurso se dice que erróneamente estimó el tribunal que el señor Ca-brera fué notificado personalmente del auto de requerimiento de pago se expone para sostenerlo que no fué notificado en la forma regulada por la Ley de Enjuiciamiento Civil enton-ces vigente como supletoria de la Ley Hipotecaria y de su reglamento.

El párrafo 5°. del artículo 171 del reglamento para la eje-cución de la Ley Hipotecaria dispone que cuando en la certi-ficación del registro· de la propiedad que ha de acompañarse con la demanda constan los domicilios de las personas intere-sadas en las responsabilidades que se hubieren inscrito des-pués del derecho del actor, el juez mandará, a la vez que el requerimiento de pago, que se intente la notificación del auto a dichas personas en aquellos domicilios si en ellos fueren habidos, y el 262 de la Ley de Enjuiciamiento Civil entonces vigente, supletoria del procedimiento hipotecario, que las notificaciones se practicarán por el escribano, secretario u oficial de sala autorizado para ello leyendo íntegramente la providencia a la persona a quien se hagan y dándole en el acto copia literal de ella, firmada por el actuario, aunque no la pida, expresando el negocio a que se refiera y que de lo uno y de lo otro deberá hacerse expresión en la diligencia, extre-mos que no constan de la diligencia que se cumplieran, pero el hecho de que no aparezca que se hayan cumplido esos requi-sitos no prueba su incumplimiento. Sentencia del Tribunal Supremo de España, 79 Jur. Civil, 493.

Por otra parte el juez no ordenó notificación de ninguna clase sino que se hiciera saber a don Gustavo Cabrera el estado del procedimiento y en este sentido aparece extendida la diligencia de cumplimiento; y aun cuando lo que ordena la ley es que se notifique el auto de requerimiento de pago, como esa disposición tiene por objeto que el acreedor tenga conoci-

miento del procedimiento ejecutivo para que pueda concurrir
a la subasta si le conviniere, *Fernández & Co.* v. *Ramírez,* 8
D. P. R., 105, de tal suerte que según el párrafo 2 del artículo
172 del reglamento mencionado, el edicto anunciando la su-
basta servirá también para hacerla saber a los acreedores
posteriores con título inscrito o anotados y con los cuales no
hubiese podido tener efecto la notificación del auto de reque-
rimiento, es claro que habiendo sido enterado don Gustavo
Cabrera del procedimiento ejecutivo que seguían los Sres.
Saurí, Subirá y Compañía con anterioridad a la subasta se
cumplió el objeto de la ley y no sufrió perjuicio alguno, si es
que por los actuarios no se le entregó copia de la providencia
del juez, lo que no se ha probado.

El tercer motivo de error dice así:

"3°. Erró la Corte de Distrito de Ponce al concluir, en su rela-
ción del caso, que 'en las dos escrituras de constitución de las hipo-
tecas que sirvieron de base al procedimiento ejecutivo mencionado, o
sea, la escritura por los hermanos Oppenheimer a favor de don Rafael
León y ante el notario don Joaquín Mayoral, en abril 30 de 1895 y
la otorgada por los propios hermanos Oppenheimer a favor de don
Joaquín P. Valdivieso y Hurtado ante el notario don Francisco Parra
en 15 de diciembre de 1880, no se expresó por parte de los deudores
su conformidad con un precio determinado para la subasta, por cuya
razón los ejecutantes en el procedimiento que motiva el presente
pleito se vieron en el caso de pedir el justiprecio de las fincas hipo-
tecadas con arreglo a la Ley de Enjuiciamiento Civil; y erró la corte
al no estimar lo contrario, o sea, que había en los títulos precio con-
signado para caso de remate y que, el pedir tasación pericial bajo
tales circunstancias, constituyó una grave infracción del procedi-
miento con perjuicio del posterior acreedor hipotecario don Gustavo
Cabrera Rosaly.''

Al alegar este fundamento se dice equivocadamente en el
alegato que la escritura de abril 30 es del año 1895, siendo
así que fué otorgada el 1885.

Al establecer la ley hipotecaria de 1893 un procedimiento
sumario para el cobro de hipotecas dispuso por su artículo
127 que en las escrituras de hipotecas se hiciera constar el

precio en que tasasen las fincas los contratantes para que sirviese de tipo a la única subasta que debía celebrarse en el caso de que, vencido el plazo del préstamo no se hubiera satisfecho; el 172 de su reglamento que el justiprecio de los bienes, convenido en el título del crédito en cuya virtud se procediese, cuando supere la cuantía de las responsabilidades preferentes aseguradas con los bienes, se expresase en los edictos como tipo para la subasta; y el 175 que los acreedores que tuvieran inscrito su derecho con anterioridad a la vigencia de la ley podrían optar por el procedimiento sumario que ella establecía, pero que cuando los títulos de sus créditos no expresasen la conformidad del deudor con un precio determinado para la subasta, habrían de acreditar ésta, consignada en documento público, o pedir el justiprecio, con arreglo a la Ley de Enjuiciamiento Civil, para preparar el anuncio de la subasta.

Las hipotecas que ejecutaron Saurí, Subirá y Compañía se constituyeron antes de regir la Ley Hipotecaria de 1893 y si bien en ellas se fijó una valoración a las fincas gravadas con las hipotecas no se consignó que esa valoración había de servir de tipo para la subasta que se verificara en caso de ejecución, por lo que si querían acomodarse al nuevo procedimiento sumario introducido por la ley hipotecaria tenían que presentar un documento en que contase la conformidad de los deudores en una valoración para la subasta o pedir el justiprecio judicial cuyo último camino siguieron los ejecutantes. No era bastante que en la escritura se valoraran las fincas sino que en el documento debía constar que la valoración era para servir de tipo a la subasta, lo que no resultaba de los contratos de préstamo hipotecario.

Se alega como cuarto error el siguiente:

"La corte cometió error al no estimar como un defecto esencial en el ejecutivo hipotecario que motivó la cancelación de la hipoteca posterior de don Gustavo Cabrera, el no haberse fijado los edictos en el barrio donde radicaban las fincas hipotecadas, y el no haberse descrito dichos inmuebles en tales edictos, y erró al estimar lo con-

trario en su relación del caso, a pesar de formular conclusiones de hecho de acuerdo con lo alegado en la demanda enmendada sobre estos extremos.''

El artículo 172 del reglamento de la Ley Hipotecaria exige que los edictos para la subasta se fijen en los sitios públicos de costumbre del lugar en que se siga el procedimiento y del en que los bienes radiquen.

Los que se publicaron en el ejecutivo que motiva este pleito se fijaron en las puertas del local de la escribanía y del que ocupaba el juzgado de primera instancia en la ciudad de Ponce, sitios que, según la prueba, eran el sitio público de costumbre para fijar edictos de venta de fincas en procedimientos seguidos en aquel juzgado y que radicaran en la municipalidad de Ponce, sin que se haya probado, ni se intentara que en los barrios en que radicaban las fincas había un sitio público de costumbre para anunciar las ventas de las fincas enclavadas en ellos.

Además la ley no exige que se haga la publicación en los barrios en que se encuentran las fincas sacadas a remate.

En cuanto a la forma en que redactaron los edictos, si bien en ellos no se expresaron las colindancias y barrios se hizo constar el nombre con que eran conocidas, el de sus dueños, el número de cuerdas que tenían y sus precios, así como que los títulos de propiedad se hallaban en la escribanía del Sr. Schroder.

Creemos con el juez de la corte inferior que tales datos fueron suficientes para dar aviso a cualquiera persona interesada en la compra de las fincas que se remataban y que ponía a su disposición los medios necesarios para conocer la descripción de las fincas y para conocer sus barrios.

Los errores tratados en los motivos 5°. y 6°. pueden considerarse conjuntamente porque se refieren a defectos en los edictos de subasta y a su publicación, que el apelante alega son causa de nulidad de la venta judicial.

En esos apartados se relacionan como tales: que en los edictos se consignó que no había derechos anotados poste-

riores a los del ejecutante; que se omitió el nombre del posterior acreedor don Gustavo Cabrera y que la inserción en la *Gaceta* del edicto de remate no se hizo por veinte días sino por catorce.

Esos hechos son ciertos pero no aparejan la nulidad de la subasta.

La razón de que se exprese en los edictos de subasta los nombres de los acreedores posteriores es el de poner en su conocimiento el procedimiento ejecutivo cuando no ha sido posible notificarles el auto de requerimiento de pago según dispone el artículo 172 párrafo 2º. del reglamento para la ejecución de la Ley Hipotecaria y se dijo en el caso de Fernández & Co. *supra*; y como don Gustavo Cabrera fué notificado personalmente e instruído del procedimiento que se seguía contra las fincas en que él tenía derecho posterior inscrito, no era de necesidad que su nombre figurase en los edictos porque ya estaba cumplido el fin que se proponía la ley.

La falta de expresarse en los edictos la existencia del crédito posterior a los reclamados tampoco fué perjudicial para el padre de los apelantes porque los datos en ellos consignados eran bastantes para hacerle saber que se trataba de las fincas que le estaban hipotecadas, y con respecto a los licitadores tampoco fué perjudicial esa omisión para el Sr. Cabrera, porque no impedía la concurrencia a la subasta y quizás la favorecía.

El punto más importante de los que estamos examinando ahora es el de no haberse publicado los edictos por veinte días en la *Gaceta*.

Por providencia de 22 de febrero de 1898 ordenó el juez que se sacaran a remate los bienes hipotecados para cuyo acto señaló el día 18 de marzo siguiente a las 2 de la tarde, y los edictos anunciándolo al público, en los que también se consignaba el lugar en que se llevaría a efecto, fueron fijados en las puertas del local que ocupaba el juzgado y la escri-

banía veinte y dos días antes del señalado para la subasta pero el que se publicó en la *Gaceta* de esta Isla no apareció en ella hasta 14 días antes del remate, y no veinte como dispone la ley.

Con estos antecedentes, la cuestión a resolver en este caso es si un acreedor posterior puede obtener la nulidad de la subasta por ese solo hecho.

El defecto de publicar los edictos por menos tiempo del requerido por la ley no anula necesariamente la subasta toda vez que puede ser renunciado por el deudor, y para que un acreedor posterior pueda obtener la declaración de nulidad por ese motivo, creemos que es un principio general de derecho que debe demostrar que ha sido seriamente perjudicado. Este principio resulta así en la obra 27 Cyc., 1710.

En este caso no hay alegación alguna, ni prueba, de que por haberse dejado de anunciar uno de los tres edictos por menos de 20 días dejaron de concurrir licitadores a la subasta; que por este motivo no se obtuvo en ella cantidad bastante para cubrir los créditos preferentes y el suyo, ni que las fincas rematadas se vendieran por menos de su verdadero valor.  Un acreedor hipotecario posterior no tiene otro derecho sobre el valor de los bienes hipotecados que a cobrarse con la diferencia entre los créditos hipotecarios anteriores y el real y positivo del inmueble.  Sentencia del Tribunal Supremo de España, 88 Jur. Civ., 70.

En consecuencia de lo que hemos expuesto, la corte no cometió error, como se alega en el séptimo motivo, por no haber declarado con lugar la demanda por todos o alguno de los motivos que se han tratado.

La sentencia impuso a los demandantes apelantes las costas, desembolsos y honorarios de abogado lo que se estima como error en el octavo fundamento del recurso.

La ley faculta a los jueces para discrecionalmente imponer las costas y desembolsos del pleito a la parte que lo pierda, teniendo en cuenta su grado de culpabilidad o de temeridad,

y también los honorarios de abogado en reclamaciones que excedan de quinientos pesos.

No se nos ha demostrado que el juez abusó de esa discreción y por tanto no es sostenible ese motivo del recurso. El caso de *Torres v. Rubianes*, 20 D. P. R., 337 que se cita por los apelantes no es de aplicación porque como revocamos la sentencia aplicamos la regla seguida por los tribunales de no apreciar temeridad porque la parte había obtenido sentencia favorable de un tribunal.

También existe en la transcripción una apelación contra la resolución que aprobó el memorándum de costas.

En este figura una partida para honorarios de abogado por $2,500 que el tribunal inferior redujo a $1,000 después de haber oído prueba respecto a este particular y no creemos que abusara tampoco de su facultad al apreciarla y al fijar la cantidad para abogado.

Por las razones expuestas la sentencia y resolución apeladas deben ser confirmadas.

*Confirmadas la sentencia y resolución apeladas.*

Jueces concurrentes: Sres. Presidente Hernández y Asociados Wolf y del Toro.

El Juez Asociado Sr. Hutchison no intervino.